David Raisman May it please the Court, David Raisman for the Quest Appellants and Cross Respondents. I have asked to reserve five minutes for rebuttal.  Watch your clock. Thank you, Your Honor. We are here on Cross Appeals covering a wide number of issues. I'd like to focus this morning's argument on the erroneous ADA standard applied by the District Court and how that applies to both the individual claim and the class claims that were erroneously cited, and if time allows, the two errors assigned by the cross appellants on their cross appeal. The common thread under all of these issues is this, under what circumstances do auxiliary aids and services provide effective communication under Title III? There are three core principles I'd like to quickly recite that underlie almost all of these issues on appeal. First, a public accommodation is not obligated to provide an identical experience, only a like experience, as this Court has repeatedly held since first announcing the rule in Bauman v. Walt Disney. So, for example, as the DOJ said when it issued its regulations, having a waiter read a menu to a blind restaurant patron, while by no means identical or equal, fully meets the effective communication obligation. So, focus on that for a minute, because you accuse the district judge of imposing an identical thing, but I don't read his opinion that way. I think he recites the correct standard. But let's use your analogy. If the waiter shows up to read the menu to blind patrons an hour after they're seated, and everybody else gets to order from the menu five minutes after they're seated, would you agree there hasn't been effective communication? No, Your Honor, I would not. Two hours? What I can tell you is under the facts of the- No, I'm asking- I'm asking- I can't draw- You have a restaurant that says, we provide menus, they're written. A blind guy will get to you sometime before we close tonight to read the menu to you. Is that effective communication? Your Honor is really asking about what is dignitary harm, if I may, and if I'm on the wrong track, please stop me. No, I'm not asking about dignitary harm. I'm asking about whether or not, there's lots of, as you say, there's lots of elements to be considered, but you started with effective communication. And so I'm asking whether or not, and that may not be the facts of this case, whether or not unduly delaying service to a blind person and giving service to abled people on a much more expedited basis is a deprivation of effective communication. I think the answer is yes, but if you think the answer is no, tell me why. I mean, perhaps unduly delaying it, that could be considered an effective communication, but what does unduly mean? We have guidance from this court, Your Honor, in the BACS case, the sign language interpreter, a video remote interpreting case, getting the translation set up and the wait for that. We have guidance from SCAF, which involved the wait for a hotel room for an hour. We have guidance from this court in Jewish, which was another hospital health care case, saying that the mere fact of waiting does not equal ineffective communication. We also have to, another portion of the court's ruling here is that we're going, that the court has decided to break down each and every segment of the experience of visiting a patient service center. And is trying to evaluate each one for whether or not effective communication was delivered in that process. I don't think the standard provides that at all. Sotomayor, what would you have the district court consider? I would have the district court consider the experience as a whole. So, for example, in one of the court's considerations below, she said Mr. Vargas was made to wait 15 minutes. What's completely devoid from the record is whether Mr. Vargas would have waited anyway, because that was a patient service center that had only one phlebotomist. And so that only one phlebotomist may be causing other people to wait. So I think this is an incredibly facts intensive inquiry. This court has so held. I think it is too, and that's what, I guess what I was trying to get at, which if it is a fact intensive inquiry. And I don't agree with you that the judge applied the wrong legal standard. The judge didn't require identical experiences, but really comparable ones. Then how do we overturn her ruling? Your Honor, I think there's a lot of bases to overturn a ruling. We're talking specifically on whether she applied the correct legal standard. I think she said like experience. She did say like experience. She absolutely did. She said a lot of the right things, but what she did was include, and there's in the pages of ER 23 and 24. And I'm going to read to you from footnote 11 on ER 24, where, well, what I'm going to read to you does not say immediate, but you'll see plenty of examples where she's actually saying they're not helped as immediately as cited patients coming across service centers. Well, but she says as immediately, and that seems to me to mean as quickly. In other words, I'm not sure there's comparisons of immediately. Immediately is right away. Isn't she really saying they're not tended to as promptly as others, and therefore their experience is not like? You may think the evidence doesn't support that, but I have a hard time thinking that she was applying the wrong standard. These are her words, and this is in footnote 11 on ER 24, 1 ER 24. The level of assistance required by the ADA, some ellipsized language, and I'm going to insert a was, phlebotomist assistance available to the same degree as the kiosk. That is not a like experience standard. That's an identical experience standard or something closer to that, and you'll see particular reference in around these same pages in the record where she's using the word immediately over and over as the basis for her ruling. I think these are difficult questions, but I think there's plenty of case law, including the three kiosk cases that have been decided by district courts where each found some degree of waiting to be experienced by folks coming into the particular businesses. Those cases are the Bartell versus Griffalls, the Plasma Donation Center, National Federation of the Blind versus Walmart. These are all in our briefs, which is, well, we know what Walmart is. West versus Moe's Franchiser, which was help using a soda fountain machine that was a self-service soda fountain machine. In each of these instances, clearly non-identical experiences and clearly not actionable in each of those cases. I don't know how Walmart helps you because isn't in that case, I mean, they have people that are actually assigned to, I mean, a person that has sight issues can just get a helper right when they come in and they'll do all their shopping with them, right? And they've got people standing around the self-checkout and all. Walmart, I know you say that helps you, but it seems like what they provide, what Walmart provided is significantly different from what you provided. Your Honor, there's plenty of examples in the record that that's the exact same thing that Quest provided. In other words, Quest does have people available at check-in. Just not, but the example Judge... Just not by necessity at each and every... That's right, the example Judge Callahan gave was that somebody, as you come in, somebody says, do you need help? That's not the case with your client. And that's not the case at Walmart either, if you read the case. The record there reflects that there was one person assigned to eight different self-service kiosks. And if any of us have been anywhere where we need assistance with self-service kiosks, you're not being immediately helped. There's a... Well, let me point out just a couple places in the record. 5ER825, and I quote, this is feedback received from patients. Some patients have problem navigating the check-in computer. The receptionist did notice the patients having difficulty and quickly intervened. 5ER832, front desk clerk assisted me in checking in as I am visually impaired. 5ER840, I am visually impaired and was immediately assisted signing in. This was extremely helpful. 5ER840, I am visually impaired. Tess saw right away that I was trouble signing in using the tablet on a floor stand by the reception window. She kindly assisted me. And there's other examples. They're catalogued in the neighborhood of page 36 through 38 of our initial brief. That's the reason the district judge, I think, in the end, denied the damage to subclass, which I think probably had a reasonable basis. But are you arguing that if some members of the class get effective communication, then an injunctive relief is never appropriate? In particular, the class prayer for injunctive relief here is inappropriate because there's absolutely no showing that on a class-wide basis, there was a consistent with what you're saying. Well, there's a bunch of affidavits and submissions, complaints that were filed with your client, all are in evidence. How does one determine that class-wide relief is not appropriate under that circumstance? Well, Your Honor, first, as we've noted, and I think Your Honor agreed, this is a fact-intensive inquiry, so we're going to have to look at each class member's experience, which is why damages should be denied. Well, no, I'm saying if more than one class member has a bad experience, and there's certainly some evidence that some class members had bad experience. Your Honor, we cite many cases in our brief for the proposition that that's not enough to show class-wide discrimination. Okay, so that was the question I asked you, so tell me what's enough. Does the judge have to conclude that a majority of class members have a bad experience or that a significant number of them? She surely doesn't have to conclude that they all do. Treating one person in the class correctly doesn't mean class-wide injunctive relief is not appropriate, so what's the standard? Well, let's look at some authority for that. I'm going to start with it's not authority, but plaintiff's own position on this at page 58 of their second brief, they use the sufficiently numerous group of legally blind individuals were harmed during the class period by class conduct. This court wrote. What's a sufficiently numerous group? If I can, we have different standards, but I think the more particular thing, and I'm sorry, Your Honor, we'll get to that, because I think the record here shows we're nowhere near that under any enunciation of the standard. So in Obrey v. Johnson, 400 F. 3rd 691 and 694, this class said that you have to have, quote, more than the mere occurrence of isolated or accidental sporadic discriminatory acts. But, counsel, here we have a company-wide policy of replacing receptionists and plebonimists with these kiosks that cannot be accessed by the blind. Your Honor, that is actually contrary to the record. It was not found by the district court. In fact, it's uncontradicted evidence here on the record that there was no plan to reduce staffing, and no staffing was actually reduced. That's not the same thing as I'm saying. I'm saying that you, that it is a company-wide policy, whether you lay off people or not, to have check-in by the kiosk. Your Honor, the check-in by the kiosk replaced the prior policy, which was to check-in by signing in, by the way, equally inaccessible to the blind. Okay, but do you do, I mean, I'm not sure why you need to fight every statement. I mean, it was a, your client decided to replace the previous system with kiosks. Replace the previous system, but not phlebotomists or other people attending. Okay. There's nothing in the record. That was, it was a company-wide policy to use kiosks to check-in. Yes? It was a company-wide policy to use kiosks to check-in, and as the court found was lawful, to provide effective communication through phlebotomists coming in and out of the courtroom. I have a question.  That I know you want to reserve time, but this has to do with what, the cross-appeal. That the plaintiffs in the present case essentially argue that because the Ninth Circuit affirmed certification of the damages class in LabCorp. Yeah. It should reverse the denial of the certification of the damages subclass here. I note that the Supreme Court has granted cert in that LabCorp case. Yes, Your Honor. To resolve the circuit split over whether a federal court may certify a class pursuant to Federal Rule of Civil Procedure 23b-3 when some members of the proposed class lack any Article III standing. Is there anything, do we need to wait for that? No, Your Honor. The court, the Supreme Court accepted certiorari on a very narrow issue as Judge Callahan just enunciated. The district court here announced its decision on a completely different theory, did not rely at all on any standing considerations. And so. But this is not, the injunctive class is not a 23b-3 class, is it? It is not. So I think what the court granted cert on is whether or not you can have a damages class when some people in the class weren't damaged. Let me be clear. I'm not resisting the idea that that decision, when it comes out, may provide an additional basis for Quest not to have this class certified or a court to so rule. But as things currently stand, the record is complete and plainly adequate. Well, the plaintiffs are relying on that case saying that the judge here was wrong because she didn't do the same thing that the three-judge panel did in LabCorp. Your Honor, I would like to address that because that's a slightly different argument because I think the courts did two different things. And I think the Davis case versus LabCorp is distinguishable on its own merits. But with respect to Saoirse Arari, the issues can be decided because Judge Gee in this district court did not rely on standing and the things she relied on, subject to an abuse of discretion standard, should be affirmed. Ironically, in the Davis case, both at the Supreme Court and otherwise, these same plaintiffs and the same counsel representing them did argue that we should defer to the discretion of the district court and its rulings. And for example, cert should not be granted because you have to defer to the discretion of the district court in determining predominance. What you're saying is with respect to the damages class, Judge Gee didn't say, I'm denying it because not everybody was injured. She denied it because of absence of commonality and predominance. Predominance and superiority, Your Honor. Superiority, which is a different argument. And quickly, because I know my time is running, the key difference with Davis is that the Davis courts did not address or consider these critical issues about what the California Unruh Act requires under White v. Square, which the district court cites in her ruling, and under Angelucci, which is the leading California Supreme Court case on what's required, and this Court in Arroyo v. Rosas accepted this reading and recorded it in its ruling as this is what's required, namely that each claimant under the Unruh Act has to prove that they encountered a barrier. And that was the heart of her ruling, both on the original class cert, they're not appealing from a different class cert ruling, Your Honors, later that came on in June of 2022, and that ruling actually, she goes over the same issue again, saying in California law, the California Unruh Act requires these things. The third and final point about why Davis is not, or the LabCorp case is not relevant here is the class that's being, whose denial is being appealed from here is clearly a fail-safe class. So this court could never certify the class that they're seeking to challenge on appeal, and that's the O'Lean decision, of course, Your Honors. I'd like to reserve the balance of my time. All right. Thank you. Good morning. Good morning. May it please the Court, my name's Jordan Porter, and I represent the plaintiffs, appellees, and cross-appellants, Julian Vargas and American Counsel of the Blind. I intend to reserve five minutes for rebuttal. I will monitor my time. I want to summarize for the Court how it may dispose of this appeal and cross-appeal, and just really briefly here. The Court should affirm the district court's judgment in favor of the plaintiffs, and reverse the district court's denial of the class certification of the Unruh subclass, and remand the matter to the district court to reconsider its superiority and predominance analysis, and the scope of the injunction on the following grounds. For one, the district court properly applied the like-experience standard, and Quest has not shown clearer on the factual findings supporting that. Well, but can you address your friend's argument? Assuming that the district court applied the correct legal standard, I take it, maybe he's not, and he can disavow this when he gets up again, that he's making really two arguments. First, he says they applied the wrong standard. Let's assume I don't accept that. He's saying even applying the correct standard, there wasn't sufficient evidence of a class-wide problem to justify the entrance of a class-wide injunction, that there may have been isolated incidents where people weren't given effective communication, but the record was just insufficient to support a class-wide injunction. I'd like you to address that, if you would. I'm happy to. To begin with, you know, this is not a disparate impact case. It's a disparate treatment case, because there was a design adopted by Quest company-wide with this kiosk rolled out, and then keeping phlebotomists in the back. It's particularly impactful where there's only one person staffing those patient-servant centers. Now, the standard is not some sort of statistical, and the court did not adopt some sort of statistical requirement, expressly did not do so in the findings of fact and conclusions of law. I think the standard is announced in Armstrong v. Davis, which is a class-action lawsuit. Rule 23b-2 enables a trial court to determine the appropriateness of system-wide relief based on the individual experiences of the named plaintiffs. In this case, we, of course, have Julian Vargas, and then we have several members of American Council of the Blind, and so that's the only evidence of what they actually experienced there when they went in. It's the only evidence that was admitted. That's sufficient to support this class-wide injunctive release class, this 23b-2 class. So what was the evidence? As I recall, there was some testimony, there were some complaints filed with Quest, and there were some affidavits, if I'm wrong? That's correct. We preceded a trial by declaration, by designation of deposition. And I'm sorry, I called declarations affidavits. Yeah, that's right, and some designation of deposition testimony, but then there was also Quest's own internal documents reflecting the complaints that they were receiving from blind people or vision-impaired people and their difficulties in using the TIS. So it was like a four-day bench trial, right? That's correct. But a lot of it was on documentary stuff, so it probably would have taken a couple of weeks if you hadn't done it that way. That's correct, yes. I mean, many, many, many of the documents that were admitted at trial were done so by stipulation. Would this have normally been a jury trial, or is it always a bench trial? It was always going to be a bench trial, because we had statutory damages, so there's no damage component for the jury to decide, and otherwise there's injunctive relief available under the ADA. So it's the UNRRAC claim that were statutory damages, right? That's correct. And the federal claim on which the injunction is based is merely an injunction? That's correct. Yeah, it's injunctive relief only. So if the part that you're asking to be reversed, are you in a little bit of trouble with the Supreme Court granting certs on the LabCorp case that you relied on so heavily? Well, I guess that remains to be seen. On the narrow issue, I agree with my colleague that the issue of standing was not something that was the basis for denying the certification of the California UNRRAC subclass. I realize it wasn't her basis, but when I read the opinion, I mean, she said that, you know, individual issues predominated over the class issues. And I just read it as it was not clear that all the class members were actually injured and entitled to damages, and that's why individual issues predominated. So in a way, she was saying that, I even wrote down that it's not clear all class members are injured, so they may not even have standing to assert this claim. Well, I think also, too, that a class member that wouldn't individualize, she said they would predominate because a class member only experienced discrimination if there was no phlebotomist available in the waiting area when they arrived, right? Certainly. Yeah. And I agree with both comments. And that's the argument your friend makes about injunctive relief, that, you know, there wasn't sufficient demonstration of these unlike experiences, but certainly the judge was within her discretion on the damages claim to find that there might be all sorts of disparate issues. For example, a blind person comes to the facility with their spouse, and the spouse has no difficulty at all using the kiosk. That person wasn't injured sufficiently to get unruh act damages, were they? If they could not use, if they were assisted by a family member? Yes. Would they be damaged? They presented, they were not able to access. They would have been damaged by the system. If a phlebotomist came out immediately, as some evidence occurs occasionally, and got the information and didn't do it in a way that broadcast it, that person would not have been injured, right? I think the court, that is what the court found. Sir, I think what the judge was saying is, there's a large class out there of blind people. Some of them may even be able to use the kiosk because the definition of legally blind is different than completely blind. And I don't want to have, I don't, this will lead to 10,000, 6,000, 7,000 separate trials about whether someone was injured because the unruh act requires injury. That strikes me as certainly something she could find based on this record. So why is it an abuse of discretion? Certainly, and let me, let me address that actually. Why is that? Is it 4,000 a person, right? It is, the statutory penalty is 4,000 a person. So if you had the whole class, what would, what would Quest be on the, I don't know that they did the math, but what would the math be? There were expert opinions on that that were not admitted, they're not part of the record. But it could be significant, certainly. It's a California class. Millions, yes. That is possible. That certainly is possible. To your question, the court made two findings, on superiority and on predominance. Okay, so with superiority, our, and this is an issue that does not appear to be encompassed by the Supreme Court's grant of certiorari in the LabCorp case, is that the unruh, the class action process is superior process for, for resolving these types of unruh claims in California. All right. Now once we get to predominance, the court's stated rationale, all right, and I certainly recognize that there may be other reasons in the record that the court can find this, but the stated rationale was that whether a, whether a class member of the unruh class encountered a patient service center at a time when the kiosk wasn't there, because there was no evidence that that could be determined. All right, well that was just, that rationale was incorrect. Certainly the class, the unruh class could be limited, for example, to a place where, to a time before the three-finger saliva solution was purportedly rolled out or partially rolled out. Could be from 2020 back to 2017, two years before the case was filed. There's no question that, and it's conceded by quest, that the kiosks were inaccessible. It could be further limited to the 109 locations in California at the patient service centers with only one full-time person. If we were to reverse the judge's finding on the unruh class, we would then have a Davis problem, wouldn't we? Because the Supreme Court is being asked to say that you can't certify a class if there are members of it who were not injured. So then she would have to somehow figure out a way to figure out whether every member of the class was injured. How would she do that? Certainly, I think that based off of quest's own records, we know when the kiosks were deployed in each patient service center in California. We know which quest patient service centers had only one full-time employee. We also know when. We don't know that in any particular case whether that employee didn't show up immediately because it was a slow day and took care of a class member or whether the class member showed up with someone who could use the kiosk on their behalf. So how would we figure out whether every member of the class was injured? That is an appropriate question. Thank you. What's the appropriate answer? Well, for one thing, based off the evidence that we had developed, the patients arriving with, you know, our class members arriving with a family member were few and far between. And that was only after they had already encountered an inaccessible kiosk, for example. But certainly, the class members in California could, you know, make a representation that they were blind. We know from the quest records whether they were there and received, you know, a blood draw or provided, you know, a urine sample or some other sample. So we know ultimately whether the services were complete. And it would be the same thing as any other case. You know, were you there with somebody else? I believe they can self-attest to that. And that would be a question, though, however, of feasibility, not predominance. But the class that you asked to be certified would include people who showed up with someone else, wouldn't it? I mean, the definition of the class was all legally blind people who visited quest facilities after a certain date. So that would include, under your class definition, people who were attended to immediately by a phlebotomist and or people who showed up with someone who could help them. Right. Well, so because the, what we're asking is that the decision to deny is reversed and remanded to the court for further consideration based off of these issues, which were not presented or were not argued on the class certification motion in any event. And so certainly the class definition for, there is no class definition for, under subclass where the class was denied certification. And it is entirely possible that those concerns could be addressed with a revised class definition. And as far as phlebotomists promptly becoming available, when there's only one phlebotomist, for example, if the class is limited to the 109 locations with one full-time employee, this is a time before the three-finger swipe was implemented. It could be limited in time as well, where the phlebotomist is not alerted and cannot promptly service a patient. There's no one there in the waiting room to actually help from quest. So I believe all those concerns, which I think are valid concerns, and I agree. However, it could be addressed with a limited revised class definition. That takes into consideration those concerns. Those are not the bases for which the court denies certification. It was superiority where we have the lab court case. It's just contrary to Ninth Circuit law. There's, of course, many other Ninth Circuit cases on superiority with UNRU in this context that also find that the class mechanism is superior. And then predominance. But the predominance, the issue was limited on predominance based off of the rolled-out schedule of the kiosks. That was it. So there's no reason why the class definition, of course, would be the same as the class definition for the B2 class with the B3 class. Having said that, you know, I think it's appropriate, however, to delay any resolution of it until after the Supreme Court has entered a ruling in the Davis versus lab court case, and we're on an expedited briefing. We expect to have oral argument at the end of April. I don't think that would be, I don't think that's an unreasonable request. It may illuminate whether this, whether it would be possible, or it actually, I think, provide a roadmap. But you do agree that the Supreme Court case would only address, only addresses the damages class portion of this? Of course, yes. The court didn't grant cert on the 23B2 issue. It did not grant cert on the 23B2. This is only the B3 issue. And it may provide some guidance. However, there was, excuse me, I was distracted by the yellow light going off. The basis for the court's denial of certification, however, was clear error, as in the stated basis. And the other issues that have been raised here today. Well, it was weird, too, because this was certification of a MEM-DISPO, too. It wasn't even an opinion, right? I don't think it was a published opinion. For, oh, for the lab Davis versus lab court. Yeah, that's correct. It was not published. Well, yeah, that's. Unusual. It is unusual. It kind of doesn't beckon well for the party that won, but you can never tell. I've had cert granted on a case that I decided, and I thought, well, they're going to reverse me, and they didn't. When there's a split in the circuit, then you don't know exactly. That's true, but we also don't know what sort of rule we fashioned for this. And maybe a rule that goes to feasibility. Who knows? We don't know yet what it's going to look like. So you're familiar with the Davis case. Am I right in thinking that there wasn't an injunctive class? There is an injunctive class. There is an injunctive class. Was it appealed in that case? The MEM-DISP doesn't seem to deal with the injunctive class. Yes, the injunctive class and the B3 class were both appealed. You said you wanted to reserve some time. I did for rebuttal. I'm at three and a half minutes if there's any other questions, I'm happy to respond. Let's go on. Thank you. Thank you, Your Honors. Very quickly, if I may, we still need to determine under the Unruh Act what the experience of each person, whether they were accompanied by a family member, whether a phlebotomist came out to greet them, whether a phlebotomist was there, all that needs to be cited in every Unruh Act case. Which is not the case for whatever the standard is. We don't have to show that every person was injured to have injunctive relief, right? Not the issue, but I do want to address that if I will. And unfortunately, there's two steps in the process. An assertion was made for the first time, never argued in either brief, that this was a disparate impact case. It is not. The plan, again, was to have paper check-in and to be assisted by effective communication. The district court actually ruled that was lawful, it was lawful to do so. In other words, the plan was lawful as long as effective communication was provided. No steps were taken to reduce staff or change the availability. It was a fact-intensive inquiry about what was going to be happening. So that is not an instance of what we're doing is unlawful. It's an unlawful policy that we're imposing. The real question is whether those decisions and the question decided by the district court, we think wrongly, resulted in discrimination. That's a classic disparate impact case. You can't dress it up on this so-called plan because you have to look at what the court found the plan was. What the court found the plan was an awareness that at a limited number of patient service centers, there might be only one phlebotomist and someone may be made to wait. I will add that this court confronted this issue last December. Even in a disparate impact case, we now have the Supreme Court decision in Muldrow versus City of St. Louis. This was decided last year, 601 U.S. 346, 354, and then followed here or questioned or discussed here in the Ohio House versus City of Costa Mesa case, a Fair Housing Act case, 122 F. 4th, 1097, and here's what the Supreme Court said. Discriminated against, we have explained, referred to difference in treatment that injure employees. So the question that this court confronted again in Ohio House in December was whether even under a disparate treatment analysis, which I say this court need not get to, this is a classic disparate impact case, even if you get there, you still need to show injury. The Muldrow case explains that. There's a difference between the three judges in the Ohio House case, but two of the judges agreed with the Supreme Court's view on that. And the third judge, Judge Acuda, did not agree. So that remains to be seen. I want to deal briefly with the- Well, counsel, you're over your time, so I think you need to sum up. Well, I've summed up the one point. Instead of starting a new one, I thank the court. All right. Thank you very much. Mr. Porter. Thank you. And I want to just clarify, this is a disparate treatment case, not disparate impact. There is no facially neutral policy that is affecting legally blind people in a different way. This is a design. This is a plan. The plan was, at least as far as patients were concerned, to reduce anxiety, to reduce wait time, to reduce frustrations. That plan only works for sighted people. The policy itself is discriminatory against blind. Well, let's assume their policy was not- And I'm just making- This is hypothetical, so you don't have to argue the facts with me. Assume their policy was, we'll put in kiosks, but we'll have a person there, as the district court said would have been fine, to deal with legally blind people. And they just didn't execute it very well. That in practice, it wasn't executed well. Would you still be entitled to injunctive relief? I think the answer is yes. The answer is yes, because it's not a real policy. But even under that hypothetical, that's not- That effective communication didn't occur, even though they intended it to occur. Would you then be entitled to injunctive relief? On the injunctive class, yes, I believe so, based off the experiences of the class members. It's representative of the entire class. It may not be perfect, but it is representative of the entire class. And that's what we have here. We have several class members who've testified at trial or through their declarations. And we also have several- You know, we have all the complaints that Quest received from their own internal documents. That's also not what happened here, in terms of what the remedy was. The remedy, the three fingers- Well, what you were arguing, and this is why I'm asking this question. One of the arguments in your brief is that the judge erred in not granting a greater remedy. Yes. And I'm having trouble with that, because if the remedy that the judge ordered was that, in effect, all people get immediate attention or quick attention, rather than through the kiosk or otherwise, then it seems to me that meets your concern. If you're arguing that kiosks are inappropriate, now we have the problem that the other side poses. So I think your argument actually supports the notion that the scope of injunctive relief ordered by the judge was appropriate. I disagree based off of what the record is and what happened at trial, in terms of what the court relied upon in limiting the scope of injunction, of the injunctive relief. And it's noted in the findings of fact, and it's noted in the conclusions of law. And that is that one, the facts were that Quest had actually replaced all the equipment in the kiosks, a couple of years before trial, after about a three or four year run of the initial equipment. All right, so the hardware was replaced. And it would be unfair to have them replace that again, given the rulemaking for these kiosks that was- The judge said, you'll satisfy the act if you can keep your kiosks, you can satisfy the act as long as you provide an alternative method for prompt effective communication with blind people. Yes. What's wrong with that? That is what the judge's ruling was. But you said that's the scope of her injunctive relief, and you say she erred in not giving you more. That's correct. I'm asking what was wrong with the scope that she gave you? The, well, what was wrong with it is that it was based, is that in the findings, it was based off of an undue administrative burden. And it was based off of expert testimony from non-disclosed, non-retained experts. It was based off of pending regulations. The limited scope were based off of testimony that wasn't presented in Quest's case in chief on undue burden. They rested before providing any of that evidence. They brought it in with Tom Walsh on day four, after a three week delay, at trial as a rebuttal witness who's not a precipient witness. That was an error, and that is expressly relied upon by the court throughout the ruling. That undue burden, that came in as rebuttal evidence, and it's also an appropriate expert evidence, because it was not based off of anything that was, you know, it wasn't precipient knowledge. It was based off a hearsay. Other people were doing things. It wasn't presented in the case in chief. Well over your time as well, so. Thank you. Thank you very much. Vargas versus Quest is submitted, and this session of the court is adjourned for today. All rise. This court for this session stands adjourned.
judges: WARDLAW, CALLAHAN, HURWITZ